In Equity.

PAULINE P. HILL el als. *vs.* LOUISE H. COBURN et als.

Somerset.    Opinion June 5, 1909.

*Trusts. Tenants in Common. Deeds. Principal and Agent. Attorney and Client.*
*Wild Lands. Limitations of Actions to Recover Same. Some Continuity of*
*Possession Necessary. Statute, 1895, chapter 162, section 1. Revised*
*Statutes, chapter 9, section 65.*

It is undoubtedly a well settled general rule that one co-tenant cannot pur-
chase an outstanding title or incumbrance effecting the common estate
for his own exclusive benefit, and assert such right against the other
co-tenants. Such a purchase will enure to the benefit of him and his
co-tenants, providing the latter elect within a reasonable time to avail
themselves of such adverse title and contribute their ratable share of the
expenses of acquiring it.

There may be cases, however, when it would not be a breach of trust for a
tenant in common to purchase an outstanding title, and retain so much
thereof as may be necessary to protect his own interest.

There is no principle of law or equity which makes it the absolute duty of
tenants in common to purchase any adverse title which might be asserted
either for their own benefit or the benefit of their co-tenants.

It is a well settled rule that a conveyance of all the right, title and interest
which the grantor has in the land described in his deed, conveys only the
right, title, and interest which he actually has at the time of his conveyance.
It is not a grant of the land itself or of any particular estate in the land. It

passes no estate which is not then possessed by the grantor, and the covenants of warranty in the deed are limited by the terms of the grant, so that an after-acquired title does not enure to the benefit of the grantee by way of estoppel.

An agent or attorney cannot without the consent of his principal or client, purchase and hold for himself an outstanding claim adverse to his employer's estate, but will be deemed to hold it for his employer, if the employer shall so elect.

The relation between principal and agent and client and attorney rests upon essentially the same basis of trust and confidence as the relation between tenants in common.

No man increases or diminishes his obligations to strangers by becoming an agent. He has agreed with no one except his principal to perform his obligations, and in failing to perform them he wrongs no one but his principal who alone can hold him responsible.

Revised Statutes, chapter 9, section 65, contemplates an actual possession of some kind. It need not be as continuous as the possession of a farm would be expected to be, but there should be some kind of continuity.

Where a person in 1867 purchased wild lands from the State at a tax sale in that year, and continuously paid the taxes thereon for more than twenty years, and from 1867 to 1901 no former owner or person claiming under him, paid any tax on the land, or any assessment by the county commissioners, or did any other act indicative of ownership, and the purchaser operated on the land from 1867 to and including 1872, under such circumstances as indicated exclusive, peaceable, continuous and adverse possession of wild lands as intended by Public Laws, 1895, chapter 162, section 1, now Revised Statutes, chapter 9, section 65, but from 1872 to 1901 there was no evidence of any kind tending to show that any one was in possession of the land for any purpose, *Held:* That the statutory condition of possession had not been proved, and hence the statute did not apply.

In the case at bar, *Held:* 1. That the defendants named in the amended bill hold in trust for the plaintiffs, in common and undivided, one-half of 4,400 acres of certain wild land. 2. That the defendants, Philbrick and Butler, named in the supplemental bill, cannot be held chargeable with any violation of trust or infraction of legal duty.

In equity. On appeals both by plaintiffs and by defendants. Appeals dismissed.

Bill in equity brought by the plaintiffs to establish and enforce a trust in certain lands in Somerset County and Franklin County, and which bill after the same had been filed was amended in several particulars. Answers were filed both to the original bill and amended bill. Afterwards by permission a supplemental bill was brought by the plaintiffs in the original bill against the same defendants and

Samuel W. Philbrick and Amos K. Butler, alleging in substance that Philbrick and Butler were the agent and attorney respectively of the other defendants and while acting as such procured and caused to be recorded certain deeds by which certain interests in the lands in which a trust was claimed against the defendants in the original bill, were conveyed to them and that these conveyances were obtained with intent to deprive the plaintiffs of their rights in said lands and were taken by Philbrick and Butler with knowledge of the trust for the plaintiffs, and praying that Philbrick and Butler be ordered to convey their interests to the plaintiffs and account for the sums received by them from the lands. To this bill the defendants demurred and answered.

The cause was then heard upon bill, amended bill, supplemental bill, answers, demurrer, replications and proof, by the Justice of the first instance who, after hearing, filed decrees sustaining the amended bill and dismissing the supplemental bill. From the decree sustaining the amended bill, the defendants named therein appealed, and from the decree dismissing the supplemental bill the plaintiffs named therein appealed.

The case is stated in the opinion.

*Heath & Andrews, Danforth & Gould, Walton & Walton, and Foster & Foster*, for plaintiffs.

*Amos K. Butler, and Charles F. Johnson*, for defendants.

SITTING: EMERY, C. J., WHITEHOUSE, SPEAR, CORNISH, KING, BIRD, JJ.

WHITEHOUSE, J. The plaintiffs in this case are the heirs or the assignees of the heirs of E. B. Hill of Skowhegan, who died in 1898. The defendants are the heirs of Philander Coburn late of Skowhegan and the legatees and devisees of Abner Coburn of Skowhegan who died in 1885 or the assignees of such heirs and devisees. They are known as the Coburn heirs.

For many years prior to September 1, 1867 and for several years thereafter, Abner and Philander Coburn were co-partners in business under the name of A. & P. Coburn, interested in the owner-

ship and management of extensive tracts of timberlands in Somerset and Franklin counties. From that date until his death, E. B. Hill had been an owner in common and undivided with A. & P. Coburn and their heirs in equal shares in a certain tract in the north half of No. 4, R. 3 west from the Kennebec river in the million acre Bingham-Kennebec purchase so called, and in a tract called the "Pray Tract" in No. 3, R. 5 and in a tract called No. 10 in 4 R. 5.

In this bill the plaintiffs seek to establish and enforce a trust in certain lands in the north half and in all of the south half of 4 R. 3, growing out of certain agreements alleged to have been made between Hill and the Coburns on September 1, 1867.

Prior to 1833 the northwest quarter of this township had been conveyed to Daniel Stewart, Jr., and the northeast quarter to Charles Dolbier. As conveyed and marked the southerly line of the northwest quarter was about half a mile farther south than the southerly line of the northeast quarter.

In 1833, Alexander Baring et als., trustees, conveyed to Abraham Colby a tract of land in the south part of the same township No. 4 R. 3, comprising all of the township except what had been previously conveyed to Stewart and Dolbier in the north half and excepting also two public lots of 320 acres each and one lot of 218 acres sold to one Keene. The area of the land thus conveyed by the Colby deed was estimated to be 10,300 acres more or less.

In 1835, Colby conveyed to James Smith 4500 acres of land in common and undivided being a part of three undivided fourth parts of the south part of the same township. The title to this 4500 acres came to the Coburns by mesne conveyances and has remained in them with the exception of 100 acres sold in 1884 to one Hinds.

In 1837, Colby conveyed to William K. Eastman one undivided fourth part of the tract purchased by him in township No. 4, R. 3, known by the name of Bigelow Township. This quarter interest conveyed to Eastman amounted to 2575 acres. Deducting this amount with the 4500 acres conveyed to Smith from the 10,300 acres and there would be left 3,225 acres still belonging to Colby. The east and west county line between Somerset and Franklin counties

run somewhat to the north of the south line of the northwest quarter or Stewart tract and about 135 rods south of the south line of the northeast quarter or Dolbier tract. Thus between the Dolbier tract and the county line in the north half of the township is a strip of land about 135 rods in width extending from the middle of the township to the east line. This tract is known as the "mountain strip" and contains approximately 700 acres east of the northwest quarter. It was embraced with the south half in the original Colby deed of 1833. The 4500 acres conveyed to James Smith and the "one fourth" conveyed to Eastman were undivided parts of the mountain strip as well as of the south half. Mount Bigelow was in the north half of the "south half." The situation is illustrated by the following diagram.

The dotted line thus - - - - approximately represents the location of the county line above mentioned. The trust which the plaintiffs seek to enforce relates to the south half and to the mountain strip in the north half.

From that portion of the findings of the presiding Justice conceded to be correct, the following facts also appear.

Subsequently to 1837 the N. W. quarter by conveyance was divided by a north and south line into two parts of equal width and the N. E. quarter of Dolbier tract was divided into two unequal parts by a north and south line.

September first, 1867, the ownership of the entire township irrespective of settlers' lots and public lots was as follows: The west half of the N. W. quarter was owned by one Miles Standish. Next toward the east was the east half of the N. W.. quarter containing 2500 acres which was owned equally by the Coburns and E. B. Hill in common and undivided. This was sometimes called the "Nubble" or the "Black Nubble." The next parcel toward the east and in the northeast quarter was what was known as the Getchell tract supposed to contain about 4000 acres. It is not in controversy that Franklin Smith having a record title conveyed this Getchell tract to Abner Coburn December 9, 1879. Next and last to the east line was the so called Moulton tract containing from 1200 to 1500 acres. It does not appear that either the Coburns or Hill ever had any ownership in the Standish or Moulton tracts. The "south half" to the Stewart line and the mountain strip between the county line and the Getchell and Moulton tracts, being all of the original Colby tract, were owned as follows: 4500 acres in common and undivided by the Coburns; one-fourth of the Colby tract or 2575 acres in common and undivided by the heirs or assigns of Eastman and the remainder 3225 acres in common and undivided by the heirs or assigns of Colby. The last two statements of acreage are based upon an estimate of 10,300 acres for the whole and the findings respecting the titles are made without considering the effect of sales made by the State for non-payment of taxes.

It appears that the practice of the State Treasurer was to receive the taxes from those claiming to own timberlands according to their

respective acreages and at the proper time to sell the number of acres which had not been paid for, that is to say, enough to make up the total number assessed and to give deeds thereof.

It is not in controversy therefore that the Coburns owned 4500 acres undivided in the two tracts and that of this 4400 acres are now held by the original defendants. The Coburns also held tax deeds which covered the whole tracts including the 4400 acres. By virtue of these tax deeds they claimed title to the whole of the two tracts and for many years their claim was uncontroverted.

It is alleged in the amended bill upon which the case was heard that the sum of $600 was paid by E. B. Hill to the Coburns for the title to one undivided half part of the north half of 4 R. 3, south of the Nubble, Getchell and Moulton tracts and a like sum for the title to one undivided half of the south half; that an agreement was made at the time that the Coburns should continue to hold the full title to all of this real estate; that the same should be managed and controlled by the Coburns and Hill as owners; that the title should be held for the benefit of the Coburns and Hill; that the timber cut should be divided equally and that the Coburns should hold the half title belonging to Hill as trustees for him; and that the Coburns always claimed to hold an undivided half of the same and the title thereof for Hill and expressed their intention to convey to him. In the defendant's amended answer it is admitted that on September first, 1867, Abner Coburn was owner in fee simple of 4500 acres in common and undivided out of the entire south half of 4 R. 3, and that on about that date A. and P. Coburn purchased under sale for taxes the tax title to all of said south half and that in the same month they sold or agreed to sell to E. B. Hill this tax title so far as it related to one-half of all the timber on said south half for $600. But the defendants deny that they sold any part of the record title of the 4500 acres or that they ever agreed to sell to Hill any title or interest or tax title only to one-half of the total timber on the south half. They admit that they made full settlement with Hill and paid him one-half of the net proceeds of the timber cut from 1867 to 1872 but deny the payment to him of any moneys received from the timber based on any ownership in him of any other interest than that of the tax title.

It is further alleged that the Coburns having purchased at tax sale the tax title purporting to cover the whole of the north half in September, 1867, sold or agreed to sell to E. B. Hill for $600 this tax title so far as related to one-half of the timber on that part of the north half of Nubble, Getchell and Moulton tracts but deny that they sold or agreed to sell any other or greater interest in the north half.

With respect to the issue thus raised the presiding Justice found as follows.

"Taking the situation as it was in 1867, taking the admissions of the Coburns in the lists of 1881 and 1884, considering the prices paid in the light of the values affixed by Gov. Coburn in the 1881 and 1884 lists; taking the general conduct of the Coburns and their successors for more than thirty years, in which Hill was treated as an equal owner, not of the timber merely, but of the land, and especially the equal division of the taxes upon the entire tract, including the 4500 acres of which the Coburns held a record title, for the same period, I am led to believe, and I therefore find that it was the intention of the Coburns to sell to Hill an undivided equal interest with themselves in the south half and the mountain strip in the north half, and that Hill should be an equal owner with them in all of the Colby tract, including their 4500 acres. They were claiming the whole, and I think intended to sell one-half of the whole. And if so, the defendants now hold in trust for the plaintiffs the equitable title thus created for Hill, and the trust can be enforced in this proceeding."

In considering the extent of the equitable title thus created for Hill and now held in trust for the plaintiffs, the presiding Justice found that the tax deed held by the Coburns covering the territory in question had no validity and that they had no valid title to any part thereof except the 4500 acres acquired through the deed from Colby to James Smith and that the remainder of the territory belonged to the heirs or assigns of Colby and Eastman unless their titles had become forfeited or barred under the provisions of the act of 1895 now R. S., chapter 9, section 65. The plaintiffs claim that these titles to Colby and Eastman had been extinguished or

barred by that statute. That act provides that when the State has taxed wild land, and the treasurer of State has conveyed it, or part of it for non-payment of tax by deed purporting to convey the interest of the State by forfeiture for such non-payment and his records show that the grantee, his heirs or assigns has paid the State and county tax thereon or on his acres or interest therein as stated in the deed continuously for the twenty years subsequent to such deed and it appears that the person claiming under such a deed and those under whom he claims have during such period held such exclusive, peaceable, continuous and adverse possession thereof as comports with the ordinary management of wild lands in this State and that no former owner has paid any such tax or done any other act indicative of ownership no action shall be maintained by the former owner or those claiming under him to recover such land or to avoid such deed unless commenced within said twenty years. "Said payment shall give said grantee or person claiming as aforesaid, his heirs or assigns a right of entry and seizin in the whole or such part in common and undivided of the whole tract as the deed states or as the number of acres in the deed is to the number of acres assessed."

Upon this branch of the case the presiding Justice made the following findings and stated the following conclusion.

"After the tax deed of September 3, 1873, of the south half, was taken by Abner Coburn, the taxes were paid continuously for more than twenty years by the Coburns, or Coburn estate, for themselves and Hill, or by the Coburn heirs and Hill. It so appears by the state treasurer's record. That deed was not recorded in Franklin county, but that was not necessary under the first clause of the statute.

I find that during all the period from 1867 to 1901, no former owner, or person claiming under him, paid any tax on the lands, or any assessment by the county commissioners, or did any other act indicative of ownership. I find that the Coburns and Hill were operating on the tract from 1867 to and including 1872, under such circumstances as indicate exclusive, peaceable, continuous and adverse possession of wild lands, as intended by the statute in ques-

tion. But from 1872 to 1901 there is no evidence of any kind tending to show that anyone was in possession of these lands for any purpose. I think the statute contemplates an actual possession of some kind. It need not be as continuous as the possession of a farm would be expected to be, but there should be some kind of continuity. A gap of more than 25 years is too long. I therefore find that the statutory condition of possession has not been proved.

It follows that the only land affected by the trust is the 4500 acres originally owned by the Coburns, less 100 acres sold in 1884. The bill will be sustained with costs, and a decree will be made to declare and enforce a trust for the plaintiffs as to one half in common and undivided of 4,400 acres in the Colby tract, namely, the south half of 4 R 3 and in the mountain strip in the north half, and for an accounting."

In accordance with these findings a decree was entered in favor of the plaintiffs against the defendants named in the amended bill. The defendants took an appeal from that decree and now have the burden of showing that the decree is manifestly wrong.

With respect to the extent of the equitable title created by the Coburns in favor of Hill, the defendants earnestly contend that the conclusion of the presiding Justice was clearly unwarranted. They say that of the tract of land in question comprising 10,300 acres, the Coburns had an indefeasible title to 4500 acres and a tax title to the remaining 5800 acres; and while they do not deny that they sold to Hill an undivided half of the tract, they insist that under the agreement of the parties Hill was to take his undivided half from the 5800 acres which they held by a tax title only, and allow them to retain the 4500 acres held by an indefeasible title and as much more from that held by tax title as was necessary to make up one-half of the tract. But in the list of "A & P. Coburn's wild lands January 1881," found in the handwriting of Abner Coburn, the following items appear with others:

"No. 4, R. 3, W.    We own with Hill ½ of Nubble 2500 A —    1250 A
Black Nubble,    "    "    ½ of North the Mt. say    1250 A
                               ½ of South of Mt. 10,000, 5000 A
                               Whole of Getchell piece, 4000 A.
                                     "    "    one P. lot      320 A.
                                                   11,820 A.

Three years later, the year before the death of Abner Coburn, another list was made by him restating his ownership with E. B. Hill in this tract of land in almost precisely the same terms employed in the list of 1881. In neither instance was there any suggestion that the Coburns' interest was in any respect different from or superior to that of E. B. Hill.

When therefore these important admissions are considered in connection with all the other evidence in the case, and with the tersely stated reasons in the summary of the presiding Justice above quoted, it is the opinion of the court that his conclusion upon this point is not only not shown to 'be erroneous, but that it appears to be fully warranted by the evidence and clearly correct.

But it appears that the plaintiffs contended at the hearing before the single Justice, and in the argument on the supplementary bill, still claim that the Colby and Eastman titles had been extinguished or barred by operation of the act of 1895, (R. S., ch. 9, sec. 65) ; and they insist that the findings of the presiding Justice that there was "no evidence of any kind tending to show that any one was in possession of these lands for any purpose" between 1872 and 1901, is not justified by the evidence and the "ordinary management of wild lands." It is not disputed that the Coburns and Hill were operating in the tract from 1867 to 1872, and it is suggested that after such unequivocal acts of ownership and occupancy a presumption of continued possession on the part of the person so operating ought to prevail, for the reason that owners of wild lands after cutting timber and permitting operations upon them are ordinarily compelled to wait a long time for such a growth of the trees left standing as will justify another operation.

In *Soper* v. *Lawrence Bros. Co.*, 98 Maine, 268, page 279, the various acts enumerated as indicative of ownership were "cutting timber and permitting operations, leasing portions of the land for the erection and maintenance of permanent sporting camps, and employing agents to protect the township against fire." But the finding in the case at bar is that there was no evidence of any kind to show that any one was in possession of the tract in question for a period of twenty-five years. This cannot be deemed ordinary,

but rather extraordinary and exceptional management of wild lands during the period named. In view of such an entire absence of any acts of ownership for such a period of time, it cannot be said that there is any presumption of fact that there was "exclusive and continuous" possession on the part of a claimant under a tax title. His conduct is equally consistent with the hypothesis that the invalidity of his tax title and his consequent trespasses in operating had been discovered and that he had been prohibited by the true owner from making further operations on the tract.

Furthermore this contention on the part of the plaintiffs is inconsistent with the whole theory and purpose of their supplementary bill. In that they allege that Philbrick and Butler are holding the Colby and Eastman titles as trustees for the plaintiffs and ask for a conveyance of those titles to them ; and in the same proceeding the plaintiffs attempt to show that the Colby and Eastman titles have become barred by the act of 1895, and practically extinguished. According to their contention, the Coburns, having the right of entry and actual seizin by virtue of this tax title, under the operation of the act of 1895, would have no occasion to ask for a conveyance from Philbrick and Butler of any extinct and worthless titles of Colby and Eastman, and the plaintiff's supplementary bill would be superfluous.

But the statute of 1895 does not apply. The Colby and Eastman titles have not been forfeited, or extinguished, and must be held superior to the Coburn tax titles.

It is accordingly the opinion of the court that the conclusion of the presiding Justice respecting this proposition was also correct, and that the defendant's appeal from the decree rendered on the amended bill cannot be sustained.

In October, 1906, the plaintiffs by permission filed the supplemental bill in question against the original defendants and Samuel W. Philbrick and Amos K. Butler. It is alleged in this bill in substance that Philbrick and Butler were the agent and attorney respectively of the other defendants and while acting as such procured and caused to be recorded certain deeds by which the interests of the Eastman and Colby heirs were conveyed to them, that these

conveyances were obtained with intent to deprive the plaintiffs of their rights in said lands and were taken by Philbrick and Butler with knowledge of the trust for the plaintiffs. The bill therefore prays that Philbrick and Butler may be ordered to convey their interests to the plaintiffs by quit claim deed and to account for the sums received by them from the lands so purchased.

The allegations in the bill respecting an unrecorded deed are not proved and require no further consideration.

It is admitted that the interests of the Eastman heirs comprising about 2575 acres were conveyed to Mr. Philbrick by deed dated October 15, 1901, finally acknowledged May 16, 1902, and delivered in June, 1902, and that one-half of these interests was conveyed by him to Mr. Butler by deed dated July 16, 1902, and recorded in 1903. For these Eastman titles the sum of $1158 was paid.

It is also admitted that the Colby interests embracing 3225 acres were conveyed to Mr. Philbrick by two deeds, one dated August 3, 1903 and the other August 13, 1903, and that Mr. Philbrick conveyed one undivided half of the same to Mr. Butler by deed dated September 1, 1903. For these deeds the sum of $8500 was paid.

The defendants, Philbrick and Butler insist that all of the land comprised by the deeds of the Eastman and Colby titles was purchased by them in entire good faith and for valuable consideration, and they deny that the plaintiffs at any time had any right, title or interest in the lands embraced in any of the conveyances in this supplemental bill and deny that they were obtained by them with the purpose or intent of depriving the plaintiffs of any right whatever or with any improper or fraudulent purposes of any kind.

With respect to the issue thus raised by the supplemental bill and answer the findings and conclusion of the presiding Justice were as follows :

"I find that the purchase of these interests were made on joint account of Philbrick and Butler. Mr. Philbrick by prearrangement took the deeds in his own name, and afterwards conveyed half to Mr. Butler. I find that Philbrick and Butler made the purchases on their own account and not on account of the Coburns heirs, and that they paid for them out of their own funds. At the time they

VOL. cv 29

knew of the plaintiff's claims, or of enough to make them chargeable with notice.

At the time they made their purchases their relations with the Coburn heirs, as attorney and agent, were such in my opinion as made it their duty to disclose to the Coburn heirs any information they had respecting any defects which existed to the Coburn title. Mr. Philbrick had been told there were defects several years before he became agent. He communicated some or all of his information to Mr. Butler.

In 1899 Butler was employed by the Coburn heirs to make from the registry of deeds an abstract of the title to 4 R. 3. He did so, made an abstract showing the defects and gave it to Mr. Philbrick, as the agent, and Mr. Philbrick placed it on file where it was open to inspection by the heirs. But the heirs, fifteen in number, were widely scattered, and it is not shown that they all saw the abstract or knew of the defects, prior to the purchases by Philbrick and Butler. But I think that since the purchases, the Coburn heirs have acquiesced and assented to the purchases by Philbrick and Butler. At any rate, I think Philbrick and Butler are now accountable to no one else. The matter now lies, I think, wholly between the Coburn heirs and Philbrick and Butler.

I have held that the Coburns and the Hills are equitable cotenants in 4400 acres and in no more. They were both co-tenants with the Eastmans and Colbys. The Coburns, as co-tenants in the 4400 acres, were not obligable to buy the interests of the Eastmans and Colbys. The interests of the Eastmans and Colbys were not outstanding titles as against the 4400 acres. Anyone might lawfully buy them. The Coburn heirs might stand by and see them sold to third persons, or lawfully assent to a sale after it was made to their agent and attorney. Such sale did not affect the rights of the Hills in the 4400 acres, and they had no other rights.

Nor in my judgment did the Hills have any equitable interest under the invalid tax title which will afford them equitable relief against one who while he was agent or attorney of the Coburns purchased the interests of the other co-tenants on his own account. The only equitable interest which they owned was in the 4400 acres."

A decree was accordingly entered dismissing the supplementary bill with one bill of costs for the defendants.

From this decree the plaintiffs took an appeal.

The solution of the somewhat novel question thus presented for determination is apparently attended with more difficulty than that involved in the original and amended bill, but a discriminating application of the established rules of co-tenancy and the equitable principles of agency and of trusts leads irresistibly to but one conclusion.

The findings of fact made by the presiding Justice appear to be supported by the evidence, and it only remains to consider the correctness of the conclusions deduced from them. ·

It is undoubtedly a well settled general rule that "one co-tenant cannot purchase an outstanding title or incumbrance affecting the common estate for his own exclusive benefit, and assert such right against the other co-tenants." Am. & Eng. Enc. of Law, Vol. 17, page 674. Such a purchase "will inure to the benefit of him and his co-tenants, providing the latter elect within a reasonable time to avail themselves of such adverse title and contribute their ratable share of the expense of acquiring it." There may be cases, however, when it would not be a breach of trust for a tenant in common to purchase an outstanding title, and retain so much thereof as may be necessary to protect his own interest. Cyc. of Law and Proc. Vol. 23, page 492; *Van Horne* v. *Fonda*, 5 Johnson, Ch. 388. In that case Chancellor Kent, after laying down the general doctrine as above stated, adds this qualification: "I will not say, however, that one tenant in common, may not in any case purchase in an outstanding title for his exclusive benefit."

But it is unnecessary to consider specifically the nature and extent of the qualifications and apparent exceptions to the general rule, for it is not claimed in the case at bar that Philbrick and Butler were co-tenants with the plaintiffs when they purchased the outstanding titles of the Eastman and Colby heirs. Nor is there any legal basis for the proposition that at the time of these purchases, the Coburns themselves were tenants in common with the Hills as to anything more than the 4400 acres to which the Coburns had an

undisputed title. It has been found that these tax titles to the remainder of the tract were absolutely without validity and that they had not been in possession of the tract under these titles for more than twenty-five years. Without such exclusive and continuous possession their tax titles did not fall within the scope of the act of 1895, and failed to receive any support or protection or acquire any validity from its provisions. The Coburns received from the State a tax deed of its "right, title and interest" in the tract in question. But at the date of the deed the State had no legal interest whatever in the land therein described and could therefore convey none to the Coburns, and the Coburns thereby acquired nothing which they could convey to the Hills.

It is a well settled and familiar rule that "a conveyance of all the right, title and interest which the grantor has in the land described in his deed, conveys only the right, title and interest which he actually has at the time of the conveyance . . . . It is "not a grant of the land itself or any particular estate in the land. It passes no estate which is not then possessed by the party." *Coe* v. *Persons Unknown*, 43 Maine, 432, and cases cited. In such a case the covenants of warranty in the deed are limited by the terms of the grant, so that an after-acquired title could not inure to the benefit of the grantor by way of estoppel. *Ballard* v. *Child*, 46 Maine, 152. The sale to the Hills by the Coburns of an undivided half of a void tax title was not sufficient to create between them a tenancy in common in the land ; and according to this rule of law, if the Coburns had executed a formal deed of this tax title with covenants of warranty an outstanding title subsequently purchased by the Coburns would not inure to the benefit of the Hills. In accordance with this view was the decision of the Court of Appeals, of New York, in *Sweetland* v. *Buel*, 164 N. Y. 451, (58 N. E. Rep. 663) announced in the year 1900. In the opinion the court say : "The appellants further contend that, as Asa Rice and Joseph Clark were tenants in common under a title obtained by virtue of the sheriff's sale and a deed given in pursuance thereof, Clary could not purchase the outstanding title of Williams Holt for his own benefit, but that, as between him and Asa Rice, the purchase

enured to the benefit of Rice as well as himself; Rice being charge-able with his proportionate share of the expense. The answer to this proposition is that neither Rice nor Clary, nor both together, obtained any title under the sheriff's deed, as the title vested in Williams Holt before such sale, as against them, under and by virtue of the deed from Elijah Holt, and consequently they never occupied the relation of tenants in common."

If the Coburns and Hill could properly be deemed co-tenants between 1867 and 1872, while they were in actual possession of the tract in question and operating upon it under these tax titles, they were not tenants in common after they had been out of exclusive possession for more than twenty-five years, their tax titles were known to be worthless and by reason of the failure of the statutory condition of possession prescribed by the act of 1895, they were not protected by the limitation of that act, but open to an attack from the true owners; and the obligation which attaches to a tenant in common, necessarily ceases after the co-tenancy has ceased to exist. 23 Cyc. page 492, and cases cited.

As above stated the Coburns and Hills must be held to be co-tenants in the 4400 acres, and thus both were co-tenants with the Eastmans and Colbys. But there was no defect in the title to the 4400 acres, and the interests of the Eastmans and Colbys were not outstanding titles as to that acreage. If therefore the Coburns were not under the obligation of tenants in common towards the Hills as to anything more than the 4400 acres at the time of the purchase of the Eastman and Colby interest, a fortiori, the defendants Philbrick and Butler, as their agent and attorney, owed the Hills no such duty.

But assuming by way of argument that the relation of tenants in common did exist between the Coburns and Hills at the time in question in the tract covered by the tax titles, it would not be controverted that any adverse titles actually acquired by the Coburns would inure equally to the benefit of the Hills, under the general rule above stated, provided the latter elected within a reasonable time to avail themselves of it and contributed their ratable share of the expenses; and it would of course be immaterial whether such

adverse title was acquired by the Coburns directly or by their agent and attorney.

But no authority has been cited by counsel or otherwise brought to the attention of the court, nor has any principle of law or equity been invoked, which would make it the absolute duty of the Coburns to purchase any adverse title which might be asserted either for their own benefit or the benefit of their co-tenants. In fact the Coburns did not purchase the outstanding interests of the Eastmans and Colbys, either for themselves or for the common benefit of themselves and the Hills, for the case finds that "Philbrick and Butler made the purchases on their own account and not on account of the Coburn heirs, and that they paid for them out of their own funds." It cannot be doubted, however, that the Coburns had full opportunity to acquire these adverse titles before they were purchased by their agents.

It is not in question that the relation of Philbrick and Butler with the Coburn heirs, as their attorney and agent, made it their duty to disclose to the heirs any knowledge they obtained of the existence of defects in the Coburn title. Philbrick had been informed that there were defects several years before he became agent, and conveyed this information to Butler. In 1899, by request of the Coburn heirs, Butler made an abstract of the title to No. 4, R. 3, disclosing the defects and gave it to Philbrick, who was the agent, and he placed it on file where it was open to the inspection of the Coburn heirs. But these heirs were fifteen in number, and while it does not distinctly appear that they all saw the abstract or knew of the defects, the case finds that after the purchase by Philbrick and Butler they all acquiesced in and assented to them. Those of the Coburn heirs who were recognized as the managing representatives of the estate, appear to have been well informed and intelligent persons who were competent to safeguard its interests. The husband of one of these heirs, a gentleman at the head of an important department in the federal government at Washington, and one who had taken an active and prominent part in the affairs of the estate, was called as a witness in behalf of the defendants. He states in substance that the titles to the lands in question and

the Hill claims were a matter of common knowledge and frequent discussion among the Coburn heirs resident in Skowhegan; that their understanding was that they had a valid title to the 4400 acres and that the Hill claim related only to the tax titles; that the Eastman and Colby titles were earlier and better than the tax titles which they believed to be void; that it was the distinct policy and purpose of the heirs not to make any investments in the purchase of "outside" and independent interests which "did not involve the tax titles," and that Mr. Philbrick as their agent, never had any general authority to make such purchases in behalf of the heirs, and never had purchased any outstanding titles for their benefit without specific directions, and that Mr. Philbrick never had any instructions or authority to purchase any outstanding titles for the Coburn heirs in the township in question. He further testifies that after the purchase of the Eastman interest and before the purchase of the larger Colby interest by Philbrick and Butler, he had an interview with Mr. Butler in which these questions were all considered between them and he then said to Mr. Butler that he understood that they were entirely within their rights in what they had done in purchasing the Eastman titles, and in what they proposed to do in purchasing the Colby interests, and that there was no objection on the part of the Coburn heirs, as "they were not in the business of buying titles from other people."

With respect to the special deposit set apart in 1902, "to assist in perfecting defective titles," it appears from the uncontradicted testimony of the defendant Philbrick that he had no authority to purchase outstanding titles with this fund without specific directions from the heirs and that he had never in fact bought any such interests, except "in cases where they were liable under a deed given, or a suit had been brought upon an adverse claim which they bought in." It also appears that in 1904, the entire amount of the "special deposit" was in fact divided among the heirs.

There is no evidence that Philbrick or Butler made any false representation to their principals, the Coburn heirs, or fraudulently concealed from them any material facts, in relation to these titles. Their conduct met the full approbation of their principals. Nor

is there any evidence or suggestion that there was any collusion between the Coburn heirs and their agents whereby the former were to derive any secret benefit from the transaction. They employed an agent not for the purpose of making new investments in timber lands, but solely to manage and protect the property which they had.

Thus, even upon the assumption that a co-tenancy existed between the Coburns and Hills under the tax titles at the time of the purchase of the Eastman and Colby interests, there is no recognized principle of law or equity whereby the Coburn heirs could be compelled to purchase those outstanding titles for the benefit of the Hills, when it was against their policy, their wishes and their judgment to purchase for their own benefit. The Hills had an opportunity to investigate the titles in that township for themselves, and to purchase any outstanding interests which they might find for sale. Even before the purchase of the Eastman title in 1901, the Coburn heirs had information of the adverse claim made by the Hills against them, and before the purchase of the Colby titles this equity suit had been commenced. The Hills had then become open litigants against the Coburns respecting these titles. The defects inherent in the tax titles themselves it was impossible to remedy, and if by superior diligence on the part of the Coburn heirs, the antecedent and better titles of the Eastmans and Colbys, entirely distinct from the tax title, had been discovered, there was no duty imposed by law or equity upon the Coburns even as tenants in common, to communicate such discoveries to the Hills. But as already shown, the Coburns did not sustain the relation of tenants in common with the Hills as to the tax title, at the time of the purchase of the Eastman and Colby titles.

The plaintiffs still insist, however, that the defendants Philbrick and Butler, as agent and attorney of the Coburns, occupied a fiduciary relation to them which the exercise of good faith would have extended to the Hills, and required them to communicate to the Hills the information which they had attained respecting those independent outstanding titles.

It is familiar law that an agent or attorney cannot without the consent of the principal or client, purchase and hold for himself an

outstanding claim adverse to the employer's estate, but will be deemed to hold it for his employer, if the employer shall so elect. It has been seen that the presiding Justice properly found that the relation of Philbrick and Butler, as agent and attorney, made it their duty to disclose to the Coburn heirs any information they had respecting the defects which existed in the Coburn title, and that this was in fact done to the satisfaction of the heirs. But the relation between principal and agent and client and attorney rests upon essentially the same basis of trust and confidence as the relation between tenants in common. It has been seen however that the Coburn heirs were not trustees for the Hills as to the tax titles at the time of the purchase of the Eastman and Colby interests, and Philbrick and Butler were agent and attorney for the Coburn heirs and not for the Hills who were adverse claimants at the time of the first purchase and adversaries in litigation at the time of the second. The Coburns and Hills were equitable co-tenants only as to the 4400 acres, and as to that acreage the interests of the Eastmans and Colbys were not outstanding titles. The fiduciary relation which Philbrick and Butler sustained to the Coburn heirs did not extend to the Hills. "No man increases or diminishes his obligations to strangers by becoming an agent. . . . He has agreed with no one except his principal to perform them. In failing to do so he wrongs no one but his principal who alone can hold him responsible." *Delaney* v. *Rochereau,* 34 La. Annuals, 1123 ; 44 Am. Rep. 456.

With the consent of the Coburn heirs Philbrick and Butler purchased the Eastman and Colby titles for their own benefit as any stranger might lawfully have done. In so doing they cannot be held chargeable with any violation of trust or infraction of legal duty.

With respect both to the original bill as amended and the supplementary bill, the certificate must therefore be in each case,

*Appeal dismissed.*
*Decree of single Justice affirmed, with one*
*bill of additional cost in each case.*